J-A14045-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE:  T.W. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  T.W. | No. 1979 MDA 2015 |

Appeal from the Order Entered October 16, 2015
in the Court of Common Pleas of York County
Civil Division at No.: 2015-SU-002707-64

BEFORE:  BOWES, J., OTT, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                    **FILED AUGUST 03, 2016**

Appellant, T.W., appeals from the trial court's October 16, 2015[1] order denying his petition for expunction of the record of his involuntary mental health commitment.  Specifically, he contends that the trial court had the discretion to expunge the record, which would remove the firearm possession restriction imposed under state and federal law, and erred in denying his petition.  We affirm on the basis of the well-reasoned trial court opinion.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Although the trial court's order was dated October 15, 2015, it was entered on the docket on October 16, 2015.  We have amended the caption accordingly.

In its January 19, 2016 opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case. (**See** Trial Court Opinion, 1/19/16, at 1-6). Therefore, we have no reason to restate them here.

For clarity and the convenience of the reader, we note briefly that Appellant was involuntarily committed to a mental health institution on March 22, 2006, under 50 P.S. § 7302 (section 302). Appellant's commitment occurred following an involuntary committal hearing, during which the court found that after responding to his call for help, co-workers found Appellant sitting in his kitchen looking at family photos with his gun beside him and drinking Jack Daniels whiskey. Appellant admitted at the hearing that he contemplated utilizing the gun and that he had several thoughts running through his head. Appellant was released from the mental health institution on March 24, 2006.

On August 12, 2015, Appellant filed a petition to expunge the record of his section 302 involuntary commitment. Appellant sought expunction under section 6111.1(g)(2) of the Uniform Firearms Act arguing that the evidence presented at the involuntary commitment hearing was insufficient to justify his commitment.[2] Alternatively, he sought expunction under section 6105 of

_____

[2] Section 6111.1(g)(2) provides a means for expungement of records of section 302 involuntary commitment where the evidence was insufficient to justify such commitment. In a recent decision, the Pennsylvania Supreme Court held Act 192 of 2014, which altered parts of section 6111.1,
*(Footnote Continued Next Page)*

the Uniform Firearms Act arguing that he was entitled to expungement because he could possess a firearm without risk. The court held a *de novo* hearing on Appellant's petition on September 16, 2015. On October 16, 2015, the trial court entered its order denying his petition for expunction. However, in that order, the court relieved Appellant of the firearms disability imposed by the Pennsylvania Uniform Firearms Act.[3] This timely appeal followed.[4]

Appellant raises two issues for our review:

A. Whether the court of common pleas has broad statutory powers to grant relief including expungement of [Appellant's] 302 commitment under 18 Pa.C.S.[A.] § 6105(f)(1) and [Appellant] is entitled to expungement of his prior commitment under the Uniform Firearms Act because he poses no risk to himself or any other person if he were to have a firearm[?]

B. Whether the evidence and testimony presented at the review hearing failed to meet the statutory requirements for involuntary commitment under section 302 of the Mental Health Procedures

*(Footnote Continued)* ⸻

unconstitutional as having been enacted in violation of the single subject requirement of the Pennsylvania Constitution, Art. 3, § 3. *See Leach v. Commonwealth*, 2016 WL 3388388, at *7 (Pa. June 20, 2016).

[3] *See* 18 Pa.C.S.A. § 6105(c)(4) (prohibiting persons involuntarily committed under section 302 from possessing, using, controlling, selling, transferring or manufacturing a firearm). The court noted that it could not remove the firearms disability imposed by federal law under 18 U.S.C.A. § 922(g)(4) (prohibiting persons who have been committed to a mental institution from possessing any firearm or ammunition).

[4] Pursuant to the trial court's order, Appellant filed his timely statement of errors complained of on appeal on December 3, 2015. *See* Pa.R.A.P. 1925(b). The trial court entered its opinion on January 19, 2016. *See* Pa.R.A.P. 1925(a).

Act and [Appellant] is therefore entitled to expungement under section 6111.1 of the Uniform Firearms Act[?]

(Appellant's Brief, at 3) (unnecessary capitalization omitted).

In his first issue, Appellant claims that the court had the authority under section 6105(f)(1) of the Uniform Firearms Act to expunge the record of his section 302 mental health involuntary commitment, and it abused its discretion by not granting his request. In his second issue, Appellant argues that the evidence presented at the involuntary commitment hearing was insufficient to meet the requirements for commitment under section 302 because the evidence did not demonstrate that he posed a clear and present danger to himself or others. Therefore, he claims he is entitled to expungement of the record under section 6111.1(g)(2) of the Uniform Firearms Act. We disagree.

"Our well-settled standard of review in cases involving a motion for expunction is whether the trial court abused its discretion." **In re Keyes**, 83 A.3d 1016, 1022 (Pa. Super. 2013), *appeal denied*, 101 A.3d 104 (Pa. 2014) (citation omitted). "However, [q]uestions of evidentiary sufficiency present questions of law; thus, our standard of review is *de novo* and our scope of review is plenary. In conducting sufficiency review, we must consider the evidence in the light most favorable to the [party that] prevailed upon the issue at trial." **In re Vencil**, 120 A.3d 1028, 1032 (Pa. Super. 2015), *appeal granted in part*, 128 A.3d 1183 (Pa. 2015) (internal quotation marks and citation omitted).

This Court has determined that "a *de novo* hearing by the trial court is required for [s]ection 6111.1(g)(2) reviews[.]" ***Vencil***, ***supra*** at 1035. At the *de novo* hearing, the trial court is required to apply a clear and convincing evidence standard. ***See id.*** at 1036. "Clear and convincing evidence is the highest burden in our civil law and requires that the fact-finder be able to come to clear conviction, without hesitancy, of the truth of the precise fact in issue." ***Id.*** at 1037 (internal quotation marks and citation omitted).

Under controlling precedent "[s]ubsection 6105(f)(1) is intended solely for the restoration of the right to possess firearms, not for the expunction of a record of involuntary commitment under the [Mental Health Procedures Act]." ***Keyes***, ***supra*** at 1022 (holding that section 6105(f)(1) of Uniform Firearms Act does not imbue trial court with authority to expunge record of section 302 involuntary commitments).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the trial court, we conclude that there is no merit to the issues Appellant has raised on appeal. The trial court opinion properly disposes of the questions presented. (***See*** Trial Ct. Op., at 14, 16-17 (concluding: (1) section 6105(f)(1) of Uniform Firearms Act does not grant court authority to expunge record of mental health act involuntary commitment; moreover, trial court did not abuse its discretion in denying Appellant's motion for expunction; (2) clear and convincing testimony and evidence was presented at *de novo* section 6111.1 sufficiency

- 5 -

review hearing to demonstrate that involuntary commitment under section 302 was proper because Appellant had suicidal thoughts and was clear and present danger to himself.)); **Keyes**, **supra** at 1022; **Vencil**, **supra** at 1035-37. Accordingly, we affirm on the basis of the trial court's opinion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/3/2016

IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA
CIVIL DIVISION

IN RE:                       :

                       :      No.    2015-SU-002707-64

THOMAS A. WALTON    :

## OPINION PURSUANT TO RULE OF APPELLATE PROCEDURE 1925(a)

## PROCEDURAL HISTORY

Thomas A. Walton (hereinafter "Petitioner") filed a *Petition to Expunge* his March 22-24, 2006 302 involuntary mental health commitment on August 12, 2015. An evidentiary hearing on the *Petition* was held on September 16, 2015 where Petitioner, Pennsylvania State Police and York/Adams MHIDD were present. The parties were permitted to file briefs following the hearing. On October 6, 2015, J.G. Bergdoll, Esq. filed the *Petitioner's Brief in Support of Requested Relief.* On October 6, 2015, Andrew J. Lovette, Esq. submitted *Pennsylvania State Police's Post Hearing Brief.* On October 6, 2015, Peter T. Ruth, Esq. filed *Respondent's, York/Adams MHIDD's, Reply Brief in Opposition to Petition for Expungement of Mental Health History.* An Order was issued on October 15, 2015 relieving Petitioner from the disability imposed by state law under 18 Pa.C.S. §6105(f)(1) but prohibiting Petitioner from possessing firearms under 18 Pa.C.S. §6105(c)(4). In addition, the Court found that Petitioner remains federally prohibited from purchasing, possessing, transferring or receiving any "firearm" as defined in 18 Pa.C.S. §921(a)(3). A *Notice of Appeal* to the Superior Court was filed by Petitioner on November 10, 2015. Petitioner was directed to file his Statement of Matters Complained of Pursuant to Pa.R.A.P. 1925(b) on November 12, 2015. Petitioner filed *Appellant's Statement of Matters Complained under Rule of Appellate Procedure 1925(b)* on December 3, 2015. Petitioner now appeals the

1

denial of his 302 commitment expungement.

## FINDINGS OF FACTS

An evidentiary hearing on Petitioner's *Petition to Expunge* his March 22-24, 2006 302 involuntary mental health commitment was held before this Court on September 16, 2015. Testimony was presented by Petitioner, Dr. Steven K. Erickson (Petitioner's expert witness) and J████ A█████ (Petitioner's current paramour). The parties stipulated to the entry of the expert witness' CV, Evaluation Report and original 302 Petition into evidence although counsel for Petitioner did not stipulate as to the actual conclusions of the 302 Petition. Counsel for the Pennsylvania State Police and York/Adams MHIDD were also present and permitted to call and cross-examine witnesses.

Petitioner has lived at his current address for sixteen years. (Tr. of September 16, 2015, p. 7.) Although Petitioner has never been married, he has maintained a romantic relationship with J████ A█████ since 2006. Id. Petitioner is currently employed by Dauphin County Adult Probation and Parole office in Harrisburg as a warrant officer and assistant supervisor. Id. at p. 8. He has worked with the department for about twenty-three years. Id. at p. 9. Petitioner has been an assistant supervisor for approximately fifteen years. Id. Currently, Petitioner is assigned to the U.S. Marshalls Fugitive Task Force in Harrisburg. Id. Petitioner reports that he has been a part of the force for about sixteen years. Id. Petitioner's main role on the force is the location and apprehension of violent offenders. Id. Petitioner testified that he has never been reprimanded or sanctioned from his job aside from a verbal reprimand for missing a court hearing. Id. Petitioner reports that he receives annual firearms training, self-defense classes and Taser training as part of being on the force. Id. at p. 10. Petitioner testified that he has been convicted of a DUI in 1988 but has no other charges. Id.

2

In regards to current medications, Petitioner is prescribed a generic form of Cymbalta for anxiety and depression. Id. at p. 11. Petitioner testified that he has been prescribed that medication since 2006. In addition, Petitioner is also prescribed a generic form of Alprazolam for anxiety on an as-needed basis. Id. at p. 12. He has similarly been on that medication since 2006. Id. Petitioner reported to engaging in various hobbies outside of work. Id. Petitioner has not been hospitalized or committed to any mental institution since March 2006. Id. at p. 13. Petitioner testified that he has not had any suicidal thoughts or posed a threat of harm to himself or anyone else. Id.

On cross-examination by the Pennsylvania State Police, Petitioner was questioned about his previous relationship with H██████ H██ that ended in 2005. Id. at p. 14. Petitioner reported that he had been engaged with Ms. H██ since 1999 but the relationship ended over lifestyle differences and disagreements related to child-rearing. Id. at p. 15. Petitioner admitted that the breakup with Ms. H██ affected both his personal and work life. Id. at p. 16. Petitioner admitted that his co-workers began noting a change in his behavior and that there were instances where Petitioner had bouts of crying at work. Id. Petitioner continued to experience a mixture of good and bad days following the breakup until around August 2005. Id. at p. 17. Petitioner characterized that he started having bad days around August 2005 when attempts at reconciliation with Ms. H██ failed permanently. Id. at pp. 17-18. As a result, Petitioner sought the help of a counselor in December 2005. Id. Petitioner reports that he attended outpatient sessions with his counselor once a week for a couple of months until March 2006. Id. at p. 19. Petitioner stopped seeing the counselor following his March 2006 involuntary committement. Id.

3

Petitioner later testified that his Alprazolam and Cymbalta medications were prescribed to him by his family practitioner for anxiety around January or February of 2006. Id. at p. 20 Petitioner admitted that he did not take the medication until the day the incident occurred that led to his involuntary commitment. Id. Petitioner reported that he would suffer panic attacks when he would go on vacation and that was the primary reason why he was prescribed the medications. Id. at p. 21.

In regards to the incident on March 22, 2006, Petitioner admitted that he had taken off work and was having a bad day. Id. at p. 24. He was lying on the kitchen floor with a pillow and pictures when he made a phone call to a previous co-worker named S███. Id. He admitted that he needed some help and asked S███ to come to his house but S███ was unable to make the long drive. Id. He mentioned that he called another friend a couple of hours later and he had answered the door when the friend arrived. Id. He walked into the kitchen with his friend and the friend witnessed the bottle of Jack Daniels, 10 milligrams of Alprazolam and the gun on the kitchen floor. Id. at pp. 24-25. Petitioner mentioned that his friend helped clean up and put the gun away. Id. at p. 25. Petitioner's friend stayed with Petitioner for a while before Petitioner went to bed. Id. Petitioner recalled that other co-workers named K███ and S███ came over the following day. Id. Petitioner admits that he had indeed made the statements contained in the 302 application to those coworkers. Id.

When cross-examined as to why Petitioner had the gun on the floor, was looking at pictures and drinking alcohol after taking anti-anxiety medications, Petitioner testified that he had thought about using the gun. Id. Petitioner testified that he had thoughts in his head and that he felt overwhelmed by the circumstances. Id. at p. 26. Petitioner testified that he thought that mental health would prevent him from continuing to work in law enforcement. Id. Petitioner

4

mentioned that he believed his employment would suffer if he reached out for help. Id. Petitioner recalled that he was hospitalized for two days, from Wednesday evening until Friday around noon. Id. While in the hospital, Petitioner participated in about two group therapy sessions after further discussion with his counselors. Id. at p. 27. Petitioner testified that he stopped seeing his psychologist, Ms. Brown, upon discharge from the hospital. Id.

Petitioner testified that he is currently in a long-term relationship with J███████. Id. at p. 28. Petitioner testified that there have never been any incidents of domestic violence in the relationship. Id. Petitioner was not involved in physical altercations or allegations of unlawful use of force aside from a current civil suit for an arrest. Id. at pp. 28-29. Petitioner characterized his relationship with his family as being very close, with frequent contact on a weekly or daily basis. Id. at p. 30. When questioned whether he feels at any risk of regressing if the current relationship does not work out, Petitioner answered that he did not feel at risk. Id. at p. 32. Petitioner further testified that he had already split up from Ms. A███████ for about six months when they initially dated and that he did not suffer any recurrence as a result. Id.

Steven K. Erickson, JD, PhD, LLM, ABPP testified on behalf of Petitioner as an expert clinical and forensic psychologist. Id. at p. 34. Dr. Erickson has met with Petitioner on one occasion, for the duration of the psychological evaluation. Id. at p. 39. Dr. Erickson's psychological report is dated July 22, 2015. Id. at p. 40. In his report, Dr. Erickson utilized the MMPI personality assessment tool and determined that Petitioner was not presently suffering from any mental health symptoms nor appeared to have any underlying personality deficits. Id. at pp. 41-42. Dr. Erickson testified that he had reviewed the information contained in the original 302 petition and believed that it was actually a friend named D████ and not S███ who had found Petitioner the day of the commitment, but otherwise found the evaluation to be true

5

and correct to the best of his knowledge. Id. at p. 41. Dr. Erickson's conclusion based on the clinical interview determined that Petitioner had suffered a single severe episode of major depressive disorder back in 2006, that Petitioner quickly recovered after he was released from the hospital and that Petitioner has had no recurrence of major depressive disorder or any major symptoms of depression since the commitment. Id. at p. 43. Lastly, Dr. Erickson concluded that Petitioner is very unlikely to pose a harm to himself or others due to his mental health and that Petitioner is at low risk as any as can be reasonably estimated by any prudent mental health professional. Id. at p. 44. Dr. Erickson testified that in his opinion, Petitioner can possess a weapon safely and appropriately. Id. at p. 48.

J█████ A█████, Petitioner's current paramour, also testified on behalf of Petitioner. Ms. A█████ testified that she and Petitioner are in a fully committed relationship since 2006. Id. at p. 50. Ms. A█████ also testified that Petitioner is not verbally aggressive or physically violent towards her. Id. at p. 51. Ms. A█████ owns a firearm but expressed no fear of possessing a firearm in the presence of Petitioner. Id.

At the conclusion of the hearing, Petitioner's counsel verbally amended the expungement petition to include expungement under 6111.1 and to remove the relinquishment requirement under 6105(f). Id. at pp. 53-54. Pennsylvania State Police stated that they do not take any position one way or the other with regard to that particular request. Id. The parties requested to address the current case law developments via post-hearing briefs. Id. at p. 55. The Court directed that the record in this matter could be sealed prior to the conclusion of the hearing. Id.

## DISCUSSION

In his *Statement of Matters Complained*, Petitioner alleges the following:

1) Whether the Appellant should have been granted expungement under 18 Pa.C.S. §6105(f) as this Honorable Court has broad statutory powers to grant the relief it deems

6

appropriate including expungement of Petitioner's 302 commitment under 18 Pa.C.S. §6105(f)(1) because Appellant poses no risk to himself or any other person if he were to possess a firearm.

2) Whether the evidence and testimony presented at the Review Hearing failed to meet the statutory requirements for involuntary commitment under Section 302 of the Mental Health Procedures Act.

Petitioner's first claim asserts that the broad language of 6105(f) allows for the expungement of Petitioner's involuntary commitment since the plain language of the statute grants the Court the ability to offer "such relief as it deems appropriate." Petitioner further details that assuming 6105(f) allows an avenue for the expungement of records, 6111.1 would not be rendered as mere surplusage because each section is its own independent and exclusive avenue to expungement relief. The relevant statutory provisions state as follows:

> § 6105. Persons not to possess, use, manufacture, control, sell or transfer firearms
> (a) **Offense defined.**--
> (1) A person who has been convicted of an offense enumerated in subsection (b), within or without this Commonwealth, regardless of the length of sentence or whose conduct meets the criteria in subsection (c) shall not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth.
> ***
>
> (c) **Other persons.**--In addition to any person who has been convicted of any offense listed under subsection (b), the following persons shall be subject to the prohibition of subsection (a):
> ***
>
> (4) A person who has been adjudicated as an incompetent or who has been involuntarily committed to a mental institution for inpatient care and treatment under section 302, 303 or 304 of the provisions of the act of July 9, 1976 (P.L. 817, No. 143),[2] known as the Mental Health Procedures Act. This paragraph shall not apply to any proceeding under section 302 of the Mental Health Procedures Act unless the examining physician has issued a certification that inpatient care was necessary or that the person was committable.

7

\*\*\*

**(f) Other exemptions and proceedings.--**

(1) Upon application to the court of common pleas under this subsection by an applicant subject to the prohibitions under subsection (c)(4), the court may grant such relief as it deems appropriate if the court determines that the applicant may possess a firearm without risk to the applicant or any other person.

\*\*\*

(3) All hearings conducted under this subsection shall be closed unless otherwise requested to be open by the applicant.

\*\*\*

18 Pa.C.S.A. §6105(a)(1),(c)(4),(f)(1) and (f)(3).


§ 6111.1. Pennsylvania State Police

**(a) Administration.--**The Pennsylvania State Police shall have the responsibility to administer the provisions of this chapter.

\*\*\*

**(g) Review by court.--**

\*\*\*

(2) A person who is involuntarily committed pursuant to section 302 of the Mental Health Procedures Act may petition the court to review the sufficiency of the evidence upon which the commitment was based. If the court determines that the evidence upon which the involuntary commitment was based was insufficient, the court shall order that the record of the commitment submitted to the Pennsylvania State Police be expunged. A petition filed under this subsection shall toll the 60-day period set forth under section 6105(a)(2).
18 Pa.C.S.A. §6111.1(a) and (g)(2).

The Superior Court has explicitly clarified the type of relief available under sections 6105(f) and 6111.1. In Keyes, the Appellant similarly argued that "18 Pa.C.S.A. §6105(f)(1) imbued the lower court with authority to expunge his record of involuntary commitments under the MHPA." In re Keyes, 83 A.3d 1016, 1022 (Pa. Super. Ct. 2013). However, the Superior Court clarified that "[s]imply stated, subsection 6105(f)(1) conveys no such authority. Subsection 6105(f)(1) is intended solely for the restoration of the right to possess firearms, not

8

for the expunction of a record of involuntary commitment under the MHPA." Id. Instead, the Court further stated that "an individual with a disability under 18 [Pa.C.S.A.] §6105(c)(4) may petition the trial court for expungement of records of involuntary treatment pursuant to 18 [Pa.C.S.A.] §6111.1(g). Id. The Superior Court reasoned that "[f]irst, section 6105(f)(1) of the Uniform Firearms Act makes no mention of expunction of records; rather, the statute is clearly directed as a vehicle for the restoration of the right to possess firearms by those whom have previously been involuntarily committed under the MHPA. When the Legislature chose to provide for the expunction of mental health records under the Uniform Firearms Act, it specifically did so in section 6111.1(g) of the Act. Second, if we interpreted section 6105(f)(1) as conveying a broad power to expunge mental health records, it would render section 6111.1(g) mere surplusage because the power to expunge mental health records thereunder would already be provided for by section 6105(f)(1)." Id. at 1023. The Court relied upon the basic rules of statutory construction to determine that 6111.1(g) would be rendered as surplusage since "statutes shall be construed, if possible, to give effect to all its provisions and that the legislature did not intend any statutory language to exist as mere surplusage." Id. Petitioner's argument that both 6105 and 6111.1 were intended to exist as independent avenues to expungement relief ignores the aforementioned canons of statutory construction.

Fairly recently in Smerconish, the Superior Court has once again reiterated that section 6105(f) is intended to provide a procedure for reinstating firearms and not a procedure for expungement. Commonwealth v. Smerconish, 112 A.3d 1260, 1265. The proper vehicle for expungement of an involuntary commitment is pursuant to section 6111.1(g)(2). Id. While we note that Petitioner is correct in that the circumstances of each case may differ, Petitioner's statutory interpretation is nonetheless incorrect based on the Superior Court's statutory analysis

9

of both sections. Absent a different interpretation from the Supreme Court or a legislative amendment to the statutory provisions, this Court is bound by the Superior Court's interpretation. Even assuming Petitioner's statutory interpretation is correct, 6105(f) gives the Court the discretion to offer "such relief as it deems appropriate" and expungement of the record would still be up to the Court's discretion and not a guaranteed relief.

Petitioner's second and final claim challenges the legality of Petitioner's involuntary commitment under Section 302 of the Mental Health Procedures Act. Petitioner relies on Vencil to argue that no evidence was provided to show a reasonable probability of suicide. In the event that an involuntary commitment is not supported by clear and convincing evidence under Section 302 of the Mental Health Procedures Act, expungement may be granted as relief under 6111.1(g)(2). See In re Vencil, 120 A.3d 1028, 1035 (Pa. Super. Ct. 2015). The applicable statutory provisions of the Mental Health Procedures Act provide that:

> § 7301. Persons who may be subject to involuntary emergency examination and treatment
> (a) **Persons Subject.**--Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself.
> (b) **Determination of Clear and Present Danger.**--(1) Clear and present danger to others shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated. If, however, the person has been found incompetent to be tried or has been acquitted by reason of lack of criminal responsibility on charges arising from conduct involving infliction of or attempt to inflict substantial bodily harm on another, such 30-day limitation shall not apply so long as an application for examination and treatment

10

is filed within 30 days after the date of such determination or verdict. In such case, a clear and present danger to others may be shown by establishing that the conduct charged in the criminal proceeding did occur, and that there is a reasonable probability that such conduct will be repeated. For the purpose of this section, a clear and present danger of harm to others may be demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm.

(2) Clear and present danger to himself shall be shown by establishing that within the past 30 days:

(i) the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act; or

(ii) the person has attempted suicide and that there is the reasonable probability of suicide unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide; or

(iii) the person has substantially mutilated himself or attempted to mutilate himself substantially and that there is the reasonable probability of mutilation unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger shall be established by proof that the person has made threats to commit mutilation and has committed acts which are in furtherance of the threat to commit mutilation.

\*\*\*

50 Pa.C.S. §7301(a) and (b)(2).


§ 7302. Involuntary emergency examination and treatment authorized by a physician--not to exceed one hundred twenty hours

(a) Application for Examination.--Emergency examination may be undertaken at a treatment facility upon the certification of a physician stating the need for such examination; or upon a warrant issued by the county administrator authorizing such examination; or without a warrant upon application by a

11

physician or other authorized person who has personally observed conduct showing the need for such examination.

(1) Warrant for Emergency Examination.--Upon written application by a physician or other responsible party setting forth facts constituting reasonable grounds to believe a person is severely mentally disabled and in need of immediate treatment, the county administrator may issue a warrant requiring a person authorized by him, or any peace officer, to take such person to the facility specified in the warrant.

(2) Emergency Examination Without a Warrant.--Upon personal observation of the conduct of a person constituting reasonable grounds to believe that he is severely mentally disabled and in need of immediate treatment, and physician or peace officer, or anyone authorized by the county administrator may take such person to an approved facility for an emergency examination. Upon arrival, he shall make a written statement setting forth the grounds for believing the person to be in need of such examination.

**(b) Examination and Determination of Need for Emergency Treatment.**--A person taken to a facility shall be examined by a physician within two hours of arrival in order to determine if the person is severely mentally disabled within the meaning of section 301 and in need of immediate treatment. If it is determined that the person is severely mentally disabled and in need of emergency treatment, treatment shall be begun immediately. If the physician does not so find, or if at any time it appears there is no longer a need for immediate treatment, the person shall be discharged and returned to such place as he may reasonably direct. The physician shall make a record of the examination and his findings. In no event shall a person be accepted for involuntary emergency treatment if a previous application was granted for such treatment and the new application is not based on behavior occurring after the earlier application.

\*\*\*

**(d) Duration of Emergency Examination and Treatment.**--A person who is in treatment pursuant to this section shall be discharged whenever it is determined that he no longer is in need of treatment and in any event within 120 hours, unless within such period:

(1) he is admitted to voluntary treatment pursuant to section 202 of this act; or

(2) a certification for extended involuntary emergency treatment is filed pursuant to section 303 of this act.

50 Pa.C.S. §7302(a),(b) and (d).

We note that the Supreme Court has granted the Petition for Allowance of Appeal in Vencil on December 16, 2015. The Supreme Court will address the issues: 1) Did the Superior Court err when it held that the standard of proof to be employed by the trial court in a sufficiency review hearing for a Section 302 involuntary commitment is clear and convincing evidence in light of the existing case law, and the exigent nature of Section 302 commitments? and 2) Did the Superior Court err when it held that a petitioner who challenges the sufficiency of the evidence of a Section 302 involuntary commitment was entitled to a *de novo* review by the trial court pursuant to 18 Pa.C.S. §6111.1(g)(2)? Until further clarification from the Supreme Court, we will analyze Petitioner's involuntary commitment under the standard utilized in Vencil by the Superior Court.

In Vencil, the Superior Court reviewed the requirements challenging a 302 involuntary commitment not in excess of 120 hours. Petitioner's case similarly did not exceed 120 hours as Petitioner was only hospitalized from March 22-24, 2006. While noting that 6111.1(g)(2) is silent on the standard of proof to be utilized in a sufficiency review, the Superior Court nonetheless concluded that a trial court should apply the clear and convincing evidence standard. In re Vencil, 120 A.3d 1028, 1036 (Pa. Super. Ct. 2015). In addition, the Superior Court concluded that a *de novo* hearing by the trial court is required for §6111.1(g)(2) reviews. Id. The trial court may consider the medical reports of Appellant's treating physicians while conducting its *de novo* hearing and is not limited solely to the initial 302 application and examination by the attending emergency room physician. Id. at 1036. Under the clear and convincing evidence standard, the trial court as fact-finder must "be able to come to clear

13

conviction, without hesitancy, of the truth of the precise fact in issue." Weissberger v. Myers, 90 A.3d 730, 735 (Pa. Super. Ct. 2014).

In reviewing the testimony and evidence presented at the hearing held on September 16, 2015, we find that Petitioner's involuntary commitment of March 22-24, 2006 was proper. Petitioner met the threshold inquiry provided by §7301(b)(2)(ii): §7301(b)(2)(ii) requires that an individual demonstrate "clear and present danger to himself" by establishing that within the past 30 days the individual "has attempted suicide and that there is a reasonable probability of suicide unless adequate treatment is afforded" and that "a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide." In the instant case, Petitioner admitted to the veracity of a majority the statements made in the 302 application. On cross-examination, Petitioner testified the following:

> ATTORNEY LOVETTE: As part of the filing of the petition, sir, did you have a chance to look at what has been marked as Exhibit C, it's the 302 application --
>
> THOMAS A. WALTON: Yes.
>
> ATTORNEY LOVETTE: -- that was filled out?
>
> THOMAS A. WALTON: Yes.
>
> ATTORNEY LOVETTE: Did you read what is in that, sir?
>
> THOMAS A. WALTON: I did.
>
> ATTORNEY LOVETTE: It indicates in there -- you mentioned about crying at work. It indicates in there that you had refused to seek voluntary treatment I believe, wouldn't relinquish your weapon. And it indicates that on Monday night a friend, co-worker, checked on him -- on yourself -- and found him on the floor with his pills dumped out, pictures spread around him, pillow on the floor, and his 9 millimeter next to him and he had been drinking JD.
>
> THOMAS A. WALTON: Jack Daniels.

14

ATTORNEY LOVETTE: It also indicates that you had told that individual some other things about wires being crossed and, pardon my French, my head is fucked up and things of that nature.

Do you recall making any of those statements to any of your co-workers on or about the March 26 date?

T████ █. W█████: I did. Can I elaborate on what is in that report?

ATTORNEY LOVETTE: Your answer is what your answer is.

T████ █. W█████: That is partially accurate. On that Monday, I had taken off work. I knew I was having a bad day. The pictures, pillow were on the floor in the kitchen. That's where I was sitting at.

I called S███ and she was at work at the time. And I said, I'm having a bad day. I need some help. She was unable to come at the time. It was a significant drive for her.

However, a couple hours after I called her, another friend of mine showed up at the house. He didn't actually find me. I answered the door. I let him in. We walked into the kitchen.

He did -- he saw everything that was there. I had a bottle of Jack Daniels. I had the – I had taken 10 milligrams of the Alprazolam which was basically the anxiety medication that was previously prescribed. We talked for a while.

He essentially cleaned up for me. You know, put the gun away, put the pictures away. And I essentially went to bed. Once I -- actually, he left and I might have stayed up for a little bit after that and then went to bed.

The next day, K███ and S███ came over. And that is when I basically, you know, told them – made the statements that you referred to.

ATTORNEY LOVETTE: And, Mr. W████, I appreciate these are difficult questions. I'm sorry for that. But they are also important questions.

Why did you have your gun with you on the floor of your kitchen when you had been looking at those pictures, drinking alcohol, and after having taken your anti-anxiety medication?

T████ █. W█████: I considered the possibility of using it. I guess that would -- I am-- I am not sure I can really answer that. Obviously, there was thoughts that were going through my head.

Because, you know, the totality of the circumstances at the time were overwhelming. And especially being in the position of my job, you know,

15

obviously mental health issues are not something that you can continue to work in law enforcement. So it was just a very confusing time, you know.

Part of me wants to say that that was kind of a -- I put everything out there hoping somebody would come and see it and realize that I needed help. I mean I kind of -- I realized it. I was just in a difficult position. It was my belief if I reached out for help, that that would in turn affect my employment.

(Tr. of September 16, 2015, pp. 24-26.)

Petitioner admitted that he contemplated utilizing the gun and had several thoughts running through his head. He also acknowledged that he needed help at that time and sought the aid of fellow co-workers. Petitioner was prescribed anti-anxiety medications by his family practitioner but was hesitant to take any medication due to preconceived notions about mental health treatment and the ability to continue to work in law enforcement. Petitioner testified that he was having a bad day and did not report to work. Petitioner recalled that he had been looking at family photos while drinking Jack Daniels and having just taken his prescription medication for the first time. We find that Petitioner likely had suicidal thoughts when he brought his 9 millimeter with him as he looked at family pictures.

We also find that Petitioner took a step in furtherance of committing suicide when he brought the 9 millimeter gun on the kitchen floor next to him. Petitioner similarly does not dispute the statements he made in the 302 application. Prior to taking off from work that Monday, Petitioner admitted to having bouts of crying at work following his separation from Ms. H██. Petitioner had attended some counseling sessions prior to the commitment but was otherwise unwilling to take his medications. Lastly, Petitioner admitted that he needed help and made several statements to co-workers in the hopes that someone would realize he needed help. Petitioner demonstrated a clear and present danger to himself when he also mixed alcohol with anti-anxiety medication and brought his 9 millimeter handgun on the kitchen floor next to his

16

pillow. Thus, upon review of the hearing testimony, we find that clear and convincing evidence existed to involuntarily commit Petitioner under §7301(b)(2)(ii) of the Mental Health Procedures Act. Since Petitioner's involuntary commitment was lawful, Petitioner is not entitled to an expungement of his mental health commitment pursuant to §6111.1(g)(2).

## CONCLUSION

This Court has thoroughly reviewed all the relevant motions, petitions and transcripts in this matter. We rely on and incorporate those pleadings and transcripts in this 1925(a) Opinion.

BY THE COURT,

John S. Kennedy, Judge

17